NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-3541
_____

TERRENCE ECHOLS,
                              Appellant,

v.

MICHELE R. RICCI, Administrator New Jersey State Prison;
ANNE MILGRAM, Attorney General, State of New Jersey,
                              Appellees.
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 09-cv-5548)
District Judge:  Hon. Jose L. Linares
_____

Submitted Under Third Circuit LAR 34.1(a)
June 28, 2012

Before:  SLOVITER, CHAGARES, and JORDAN, *Circuit Judges*.

(Filed: July 19, 2012)
_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Terrence Echols appeals the judgment of the United States District Court of the

District of New Jersey denying his petition for a writ of habeas corpus.  Echols argues

1

that his petition should have been granted due to ineffective assistance of counsel. For the following reasons, we will affirm.

## I. Background

### A. *Facts*

Franklin Powell was a drug dealer in New Jersey and sold cocaine for prices that undercut the business of a rival drug gang known as the "Hit Squad." The Hit Squad responded by targeting Powell and, on the night of September 3, 1994, two assailants shot and killed him in his Newark residence. On the night of the shooting, the two men approached Powell's apartment with their faces covered. One of the assailants entered through the back door with a gun while the other came through the front of the building carrying an automatic weapon. The two chased Powell upstairs and shot him as he attempted to protect his sister, Lisa Lucas.

In the subsequent police investigation, a witness named Darrell Jones identified Joseph Brown and Echols as Powell's killers. Jones, who was at the scene, told police that he saw Brown kick down Powell's front door.[1] Jones then heard shots and saw two men, Brown and Echols, flee from the apartment. Based on Jones's statement, police apprehended Brown and Echols.

Upon his arrest, Echols gave a statement to the police indicating that he was with a number of people in a parking lot located within view of the back door of Powell's residence, and that he ran with others when he heard the shots. Echols stated that he did

---

[1] While Jones indicated that Brown's head was covered, he said he could recognize Brown because he had seen him earlier that day.

2

not shoot anyone and that a man named Keith Eutsey had killed Powell. Echols passed a polygraph test administered by police. Based on Echols's statement and the polygraph results, he was released and the police arrested Eutsey and charged him with Powell's murder. Later, however, Echols admitted to Eutsey's private detective that he had falsely accused Eutsey, and, as a result, the state dropped the charges against Eutsey and renewed their investigative efforts. That investigation ultimately produced three additional witnesses who implicated Echols as one of Powell's assailants.

The first of those witnesses, Shalika Thomason, Echols's former girlfriend, came forward after Echols accosted her with a knife on November 10, 1994 and tried to force her to leave her apartment with him, complaining that he would serve 25 years in prison because of her.[2] Thomason told police officers that she saw Echols enter Powell's home on the night of the murder and that she saw him come out of the home right after the shooting.[3] The second witness, Tracey Irvin, the mother of Powell's son, came forward on May 20, 1995 after Echols told her to stop talking about the murder or else he would kill her.[4] She told police that she saw Echols running from the back of Powell's house holding his side on the night of the murder. The third witness, Ada Dansby, is another

---

[2] Echols apparently believed that Thomason had made a statement to police implicating him in the Powell murder, although, at the time of the threat, she had not made such a statement.

[3] Specifically, Thomason said that on the night of Powell's murder, Echols and his friend "Brown went into the alleyway and five minutes later came back out with shirts tied around their face[s], then they ran up the porch of [Powell's sister's house] … . [Echols] told [Brown] to go around the front of the house, they both went into the house. Then no more than two minutes later I heard gunshots. About five minutes after that [Echols] and [Brown] came running out." (App. at 429a.)

[4] Irvin initially told police that she did not witness the shooting.

former girlfriend of Echols who has a son with him. She told police that, on June 5, 1995, Echols robbed her and threatened to kill their son because his name, Shaquill, was similar to Powell's nickname, Quill.[5] According to Dansby's statement, Echols "admitted to killing [Powell] … when he said to me that he was going to do to my [s]on like he did to Quill." (App. at 436a.)

B.     *Trial*

A grand jury indicted Echols in connection with the killing of Powell, charging him with, among other things, felony murder, aggravated manslaughter, third degree burglary, and weapons offenses. In June 1996, Brown and Echols were tried jointly for Powell's murder in the Superior Court of New Jersey, Law Division. By that time, each of the four witnesses against Echols had recanted their statements to police except for Irvin. During his opening statement, the prosecutor sought to explain the recanted statements that would come up during the course of the 18-day trial. He said:

> [Y]ou are going to have people [recant their prior statements].
> … Listen to everything with an open mind. These are not
> people like you[, who] are able to sit in a fairly nice
> courtroom in Essex County. [Court] officers are here, so that
> you can feel safe and comfortable. You know that nothing is
> going to happen to you. You are just hearing evidence.
> Think about the people who are living in the community and
> why they might say, [w]ell, my son is more important. My
> life is more important. I never saw nothing. I don't want to
> be involved anymore. Get me out of this.

(App. at 270a.)

---

[5] Dansby said, "[w]e were talking about my baby and [Echols] said that my baby should be dead. He said that my baby should be dead because I named him ShaQuill[]. He never liked [that name] because he killed Quill[], so he never approve of [that] name." (App. at 435a.)

The prosecution called Jones, Thomason, Dansby, and Irvin, among other witnesses, to testify. Jones testified that he had lied when he told the police that he saw Brown and Echols at the scene of the murder. In explaining his prior statements, Jones said that he owed Brown money and implicated him in order to escape repayment of the debt. Jones further claimed that he was scared of what the detectives would have done with him had he not implicated Brown and Echols.

In her testimony, Dansby insisted that she could not recall any of her prior statements to police implicating Echols in the crime. Dansby testified that she could not recall telling police that Echols admitted to her that he had killed Powell and that he was bragging about the murder. She further testified that she could not recall telling police that Echols threatened to kill her son Shaquill like he had killed Powell. Perhaps explaining her memory lapse, Dansby said that, on the morning of her testimony, someone "put a gun in [her] face" and told her to "shut up." (App. at 288a.)

Thomason testified that she could not recall making statements to police after the murder, and that she never told police that Echols had kidnapped her at knifepoint. She testified that she had lied to police when she told them that she saw Brown and Echols put on masks, enter Powell's residence, and then exit the building shortly after she heard gunshots. She said that she lied to police because Echols had cheated on her and had a baby with Dansby while she and Echols were still together.

Irvin was the only witness of the four who did not recant her statement to police. She testified that, after Powell was shot, she saw Echols running from the

5

home and apparently holding something. She further testified that Echols threatened to kill her if she kept talking about the Powell murder.

In investigating possible defenses, Echols's trial counsel noted that Echols told police that he was in the parking lot near Powell's residence at the time of the murder and that "Rasheed" or "Rashine" saw him in the parking lot as shots were fired. Echols's counsel presumed that Echols was referring to Rashine Donaldson, but he discovered that Donaldson's statements to police would likely not allow for an alibi defense.[6] As a result, he did not file a notice of alibi defense, as he was required to do by state law as a prerequisite to presenting such an argument. Shortly before trial, however, Echols's counsel discovered that "Rashine" might be a reference to Rashine Smallwood rather than Donaldson. Trial counsel thus added Smallwood to the witness list and presented Smallwood's testimony near the end of the trial. Counsel did not, however, give advance notice of an alibi defense.

Prior to Smallwood's testimony before the jury, the trial judge held a preliminary hearing. Trial counsel submitted that Smallwood would testify that he saw Echols in the parking lot outside of the Powell residence when shots were heard. The Court asked if that testimony amounted to an alibi defense; counsel responded by framing the testimony as an identity defense – that the identification of Echols as the man who entered the home and then ran from it could not be correct since Smallwood saw Echols in the parking lot during the shooting. Trial counsel submitted that since Smallwood would only testify

---

[6] In his police statement, Donaldson did not indicate that he saw Echols at the time of the shooting.

6

that he saw Echols, not that he was with him, it was not an alibi defense.  The Court

heard Smallwood's testimony outside the presence of the jury:

> [Defense Q]: I'm going to invite your attention back to …
> September 3rd, 1994, at about 10:00, 10:30 in the evening in
> the area of [Powell's residence]. Remember that night?
> A: Yes
> …
> Q: … Where were you?
> A: In the parking lot … [at] Broadway and Broad Street.
> Q. And tell me what you heard in the parking lot at that date
> and time?
> A. Gunshots.
> …
> Q. [W]as there anybody else that you could see when you
> heard the gunshots?
> A. Oh, yes. When I ran we got down to the end of Broad
> Street, it was me, [others, and Echols].
> …
> Q. … And did you see a gun in [Echols's] hands?
> A. No.

(App. at 355-56a.)  During cross-examination, Smallwood confirmed that "[Echols] was

right there with us at the end of Broad Street at the time when the shots [were] being

fired."  (*Id*. at 357a.)

The prosecution objected to Smallwood testifying on the grounds that he was an

alibi witness and defense counsel did not provide notice of an alibi defense.  The Court

asked whether this was the first time Echols's counsel knew that his client had an alibi.

Echols's counsel answered in the affirmative, explaining the confusion between

Donaldson and Smallwood and the difficulty he experienced in locating Smallwood.  The

Court permitted Smallwood to testify before the jury, and he testified as follows:

7

[Defense Q]: I'm going to ask you to remember back to … September 3rd, 1994, 10:00, 10:30 in the evening. Remember that day?
A: Yes.
Q: And where were you at the time?
A: In the parking lot [in the area of Powell's residence].
…
Q: … [W]ere you with anybody in the parking lot that evening at that time?
…
A: I was around [others and Echols].
Q: … And did something happen then, did you hear anything?
A: Yes, I heard shots.
…
Q: And what did you do?
A: I ran [along with others and Echols].
…
Q: At any time did you see any gun in the hands of [Echols]?
A: No.

(App. at 360a.)

At the close of the trial, Echols's counsel requested an alibi instruction. The trial court determined that an alibi instruction was not appropriate because it did not view Smallwood's testimony as creating an alibi defense.[7] It therefore declined to give that charge, although it did tell the jury that, "[w]here the identity of the person who committed the crime is in issue, the burden of proving identity is upon the State." (App. at 198a.) After deliberating, the jury found Echols guilty of felony murder, aggravated manslaughter, third degree burglary, and weapons offenses.

---

[7] More specifically, the Law Division reasoned that an alibi requires that the defendant be in a different location and that, because Smallwood placed Echols around Powell's residence, his testimony could not be considered an alibi defense.

8

Echols appealed. His appellate counsel raised several issues, but did not appeal the trial court's refusal to provide an alibi instruction or challenge the prosecution's remarks during opening statements concerning the safety of the jurors. The Superior Court of New Jersey, Appellate Division, affirmed and the Supreme Court of New Jersey denied a petition for certification.

C.    *Collateral Review*

In 2001, Echols filed a petition for post conviction review ("PCR") with the Superior Court of New Jersey, Law Division. Echols claimed, among other things, that his trial counsel was ineffective for failing to present the alibi defense properly, and that appellate counsel was ineffective for failing to raise the issue of prosecutorial misconduct with respect to comments made during the prosecutor's opening statement and for failing to challenge the trial court's refusal to grant an alibi instruction. With respect to the alibi issue, the Law Division concluded that the trial court had rightly reasoned that "Smallwood was not an alibi witness" because Smallwood placed Echols "merely fifty feet from the murder scene" and that an alibi defense required that the defendant be in some different location. (App. at 194-95a.) The Law Division further determined that, even if Smallwood were an alibi witness, the errors in the case were harmless because Smallwood testified and the jury was instructed that guilt had to be proven beyond a reasonable doubt and that the burden of proof was on the government to prove that

Echols committed the crimes charged.  The Court noted that an identification charge was given to the jury, which is similar to an alibi charge.[8]

The Court then turned to the government's comments during the opening statement that could have been construed to suggest that Echols posed a danger to the

---

[8] The identification charge given to the jury is as follows:

> TERRANCE ECHOLS and JOSEPH BROWN as part of their general denial of guilt contend that the State has not presented sufficient reliable evidence to establish beyond a reasonable doubt that they are the persons who committed the alleged offense.  Where the identity of the person who committed the crime is in issue, the burden of proving that identity is upon the State.  The State must prove beyond a reasonable doubt that TERRANCE ECHOLS and JOSEPH BROWN are the persons who committed the crime.  The defendants have neither the burden nor the duty to show that the crime, if committed, was committed by someone else or to prove the identity of that other person.  You must decide, therefore, not only whether the State has proven each and every element of the offense charged beyond a reasonable doubt, but also that they are the persons who committed it.

(App. at 198a.)

The model alibi charge in 1997 was as follows:

> The defendant as a part of (his/her) denial of guilt contends that (he/she) was not present at the time and place that the crime was allegedly committed, but was somewhere else and therefore could not possibly have committed or participated in the crime.  Where a person must be present at the scene of the crime to commit it, the burden of proving the defendant's presence beyond a reasonable doubt is upon the State.  The defendant has neither the burden nor the duty to show that (he/she) was elsewhere at the time and so could have not committed the offense.  You must determine, therefore, whether the State has proved each and every element of the offense charged, including that of the defendant's presence at the scene of the crime and (his/her) participation in it.

(*Id.*)

jurors. It viewed the comments in context of the prosecution's attempt to explain the witnesses recanting their statements and determined that the failure to raise the issue did not constitute ineffective assistance of counsel. The Law Division thus denied Echols's petition.

Echols appealed that decision to the Superior Court of New Jersey, Appellate Division, which reversed the judgment of the Law Division and remanded for a new trial. The Appellate Division found that trial counsel was ineffective for failing to fully elicit alibi testimony from Smallwood inasmuch as Smallwood's testimony outside of the presence of the jury clearly indicated that he saw Echols as shots were being fired but his testimony before the jury was ambiguous. The Court also found that appellate counsel was ineffective for failing to raise the trial court's refusal to give an alibi instruction. The Appellate Division finally determined that the prosecutor's remarks during opening statements stepped beyond the bounds of proper advocacy and that trial counsel was ineffective for failing to object to that remark.

The State filed a petition for certification with the Supreme Court of New Jersey, which granted the petition and reversed the Appellate Division. *State v. Echols*, 972 A.2d 1091 (N.J. 2009). The Supreme Court first evaluated the prosecutor's opening remarks related to the safety of the jurors. According to the Court, the prosecutor's remarks were not "so egregious that [Echols] was deprived of a fair trial. The prosecutor intended to show that several witnesses were threatened and intimidated as part of the State's effort to explain the change in their anticipated testimony, and informed the jury of that." *Id*. at 1100. Even though the comments may have been out of place, the Court decided that

11

"the prosecutor's brief reference to the safety of the jury in the beginning of the eighteen-day trial was not so egregious as to be reversible error." *Id*. The Court further held that, because the statement itself was not reversible error, "the failure of trial counsel to object to the comments or the failure of appellate counsel to raise that issue on appeal could not lead to the conclusion that there is a reasonable probability that, but for the errors of trial and appellate counsel, the outcome would have been different." *Id*. It thus rejected Echols's "claim that his trial counsel and appellate counsel provided ineffective assistance of counsel in regard to [that] issue." *Id*.

The Supreme Court then turned to the contention that Echols's trial and appellate counsel were ineffective in their handling of the alibi defense. The Court first held that trial counsel's failure to get the same testimony from Smallwood before the jury as Smallwood had given during the proffer hearing "did not render his performance 'below an objective standard of reasonableness.'" *Id*. at 1101 (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)). It based its conclusion on the determination that Smallwood's trial testimony, if believed, was sufficient for the jury to understand that Smallwood claimed that he saw Echols outside as the shots were fired. Even assuming that trial counsel had been ineffective, however, the Court determined that Echols's claim of ineffective assistance could not succeeded since "any minor deviation between Smallwood's testimony at the … hearing and his testimony before the jury could not have affected the outcome of the trial." *Id*.

The Supreme Court then examined Echols's claim that the trial court erred in failing to provide an alibi instruction. Since the jury was permitted to hear Smallwood's

12

testimony to the effect that Echols was outside with him, not inside killing Powell, the Court agreed with the Appellate Division that the trial court should have given an alibi charge. Ultimately, however, the Court determined that the failure to give an alibi charge was not reversible error because "[t]he important thing is to make it plain to jurors that to convict they must be satisfied … that guilt has been established beyond a reasonable doubt" and that "[t]here is no need to speak of alibi in such separate terms." *Id*. at 1102 (citation omitted). In the present case, the Court determined that the trial court's instruction, including the identification charge, made it such that the jury understood that the government needed to prove that Echols was in Powell's building at the time of the shooting. As a result, the failure to give an extra instruction specific to the alibi issue was "utterly harmless." *Id*. at 1103 (citation omitted).

Having lost in his efforts at post-conviction relief in the state courts, Echols next petitioned for a writ of habeas corpus in the United States District Court for the District of New Jersey. He argued, among other things, that his trial counsel was ineffective for failing to properly present the Smallwood alibi defense and that his appellate counsel was ineffective for failing to raise the prosecutor's opening remarks and the lack of an alibi instruction as issues on direct appeal. In a detailed opinion, the District Court examined those claims and ultimately denied the petition.

With respect to the alibi issue, the District Court first addressed Echols's claim that trial counsel was ineffective for discovering Smallwood "too late" and for failing to fully elicit Smallwood's testimony. (App. at 44a.) It noted that trial counsel had asked a "virtually identical" set of questions both in the presence and absence of the jury,

13

allowing Smallwood to offer the same testimony. (App. at 47a.) The Court also observed that the prosecution made an extensive and serious challenge to Smallwood's testimony during cross-examination. Ultimately, the District Court found that, looking at trial counsel's questions and Smallwood's responses, there was enough testimony offered for the jury to conclude that Smallwood saw Echols as shots were being fired if they chose to believe Smallwood. As a result, the District Court determined that trial counsel had presented the defense and was not ineffective.

The District Court then turned to Echols's argument that trial counsel was ineffective for failing to properly notice the alibi defense. The Court dismissed that argument because, for a habeas petition to survive, it must allege an unreasonable application of established federal law as articulated by the Supreme Court. State procedures governed presentation of the alibi defense, and, the Court said, failure to comply with state procedures did not give rise to a habeas claim here because the failure did not violate any constitutional right. The Court further noted that Smallwood was ultimately permitted to testify, rendering any error by trial counsel harmless.

Regarding the lack of an alibi instruction, the District Court stated that a habeas challenge to jury instructions will only be successful if the instruction "so infected the entire trial that the resulting conviction violate[d] due process." (App. at 51a (quoting *Estelle v. McGuire*, 502 U.S. 62, 72-73 (1991).) Because the instructions were "crystal clear" and stated that "[t]he State must prove beyond a reasonable doubt that [Echols is] the person[] who committed the crime" (App. at 52-53a (alterations in original)), the District Court determined that trial counsel's performance was not ineffective and,

14

likewise, appellate counsel was not ineffective for failing to raise the lack of an alibi charge on direct appeal.

The District Court also examined Echols's claim that trial counsel's theory of the case and summation were inept. Trial counsel had advanced the theory that Eutsey was indeed the gunman, that Echols had properly named him in the aftermath of the shooting, and that Eutsey was not prosecuted because he was related to a Newark detective, Jack Eutsey ("Officer Eutsey"), who handled his arrest. The District Court determined that the defense theory was appropriate in light of the fact that Echols was charged with killing Powell and making false statements against Eutsey. It further noted that the defense theory was clearly articulated in the opening, through the direct and cross-examinations, and in the closing argument. While Echols argued that his trial counsel should have jettisoned the Eutsey theory in favor of a Smallwood-alibi theory, the Court held that defense counsel clearly made a strategic choice and one that was not unreasonable, given that Smallwood was discredited on cross-examination.[9]

The District Court also addressed Echols's claim that the prosecutor's remarks relating to the presence of officers in the courtroom to ensure the jurors' safety denied him the due process right to a fair trial. The Court contrasted the brief remarks with the lengthy opening statement that came at the start of the 18-day trial, and it noted that the remarks came in the context of the prosecutor's attempt to explain the many witnesses

---

[9] Specifically, even though Smallwood testified that he had his eyes on Echols for a full two hours on the evening of the murder, he was unable to identify others that were in the same parking lot that evening, admitted that his attention was focused on a "young lady," and was unable to recall other details about his surroundings. (App. at 47-48a.)

15

who later recanted their statements to police. Considered in that light, the Court determined that the remarks did not result in a constitutional violation. Last, the Court determined that, even combining all of the errors alleged by Echols, his due process right to a fair trial was not violated.

After the District Court declined to issue a certificate of appealability ("COA"), Echols applied to us for a COA and we granted one with respect to four issues: "whether trial counsel provided ineffective assistance because his handling of the alibi defense was 'inept'; whether appellate counsel provided ineffective assistance because he failed to raise the issue of prosecutorial misconduct in the opening statement; whether appellate counsel provided ineffective assistance because he failed to challenge the lack of an alibi instruction; and whether relief is warranted on the basis of cumulative error." (App. at 119a.)

## II.    Discussion[10]

Echols argues that the Supreme Court of New Jersey unreasonably applied *Strickland v. Washington*, 466 U.S. 668 (1984), in determining that his trial and appellate counsel were adequate. We first articulate the legal standard for habeas review of a *Strickland* claim and then turn to each of Echols's assertions of ineffective assistance of counsel.

---

[10] The District Court had jurisdiction petition pursuant to 28 U.S.C. § 2254. We have appellate jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253. We exercise plenary review over the decision of the District Court denying Echols's petition. *Stevens v. Del. Corr. Ctr.*, 295 F.3d 361, 368 (3d Cir. 2002).

16

A.  *Legal Standards*

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), we will not grant a petition for a writ of habeas unless the state court decision under review "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  The state court's factual determinations are presumed correct unless Echols can overcome that presumption with clear and convicting evidence to the contrary.  *Id.* § 2254(e)(1).

Echols argues that the Supreme Court of New Jersey unreasonably applied of *Strickland* in determining that his trial and appellate counsel were not ineffective.  To succeeded in that argument, he "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification [under Supreme Court precedent] that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011).

In *Strickland*, the Supreme Court held that every criminal defendant has a Sixth Amendment right to effective assistance of counsel at trial, 466 U.S. at 687, and that right also applies to appellate counsel on direct appeal, *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985).  In order to make a successful *Strickland* claim, counsel's performance must be deficient beyond an objective standard of reasonableness.  In reviewing counsel's actions, we are highly deferential and presume that counsel was effective.  *Strickland*, 466 U.S. at 689.  Further, we refrain from second-guessing counsel's actions.

17

In addition to showing that his lawyer was deficient, Echols must also show that the "deficient performance prejudiced the defense." *Id.* at 687. To prove prejudice, a defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Consistent with *Richter*, when evaluating a *Strickland* claim on habeas review, we do not ask whether counsel was deficient, but instead look to the Supreme Court of New Jersey's decision, asking whether it unreasonably applied *Strickland* in determining that counsel was not deficient. *Richter*, 131 S. Ct. at 785 ("The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. … When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." (internal citations and quotation marks omitted)).

Thus, our inquiry under *Strickland* in the AEDPA context is whether the New Jersey Supreme Court's determination that trial and appellate counsels' actions were not deficient "was so lacking in justification that there was an error well understood and comprehended in existing [United States Supreme Court precedent] beyond any possibility for fairminded disagreement." *Id.* at 786-87. The Supreme Court of New Jersey's careful decision was not lacking here.

18

B.    *The Alibi Defense*

Echols argues that his trial counsel was ineffective for failing to locate and interview Smallwood in a timely manner, precluding proper notice and presentation of an alibi defense. He suggests that the investigative failure led to the trial court's refusal to give an alibi instruction and thereby precluded trial counsel from mentioning the alibi during his opening statement and closing argument. Trial counsel of course had a duty to investigate Echols's case and possible defenses, *Strickland*, 466 U.S. at 691 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."), and we do not understand the state courts to have said otherwise. But, the Supreme Court of New Jersey did not unreasonably apply *Strickland* in determining that, because Smallwood was permitted to testify before the jury and because that testimony presented the alibi defense, trial counsel's performance was neither deficient nor prejudicial.[11]

Echols's argument suggests that, in the absence of the alibi theory, there was an aimless defense. That is not the case. Trial counsel argued – from opening through summation – that Echols was not the assailant, that Eutsey was one of the assailants, and that Eutsey got away with it because a blood-relative worked in the Newark police department. That tactical choice is precisely the sort of decision which *Strickland*

---

[11] Echols cites *Williams v. Taylor*, 529 U.S. 395 (2000), for the proposition that the investigation should have been timely. *Williams*, however, is a case where defense counsel failed to offer any part of "voluminous" favorable evidence to a sentencing jury, leaving a void in the presentation. *Id*. at 396. Here, not only was the Smallwood alibi evidence introduced, but trial counsel also advanced a plausible theory of the case throughout the trial.

19

precludes us from second guessing. *Cf. Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.").

Citing *Wiggins v. Smith*, 539 U.S. 510 (2003), Echols argues that trial counsel's lack of investigation put him in a position where a reasonable strategic choice could not be made. Counsel's theory all along, however, was that Echols did not shoot Powell and that, although he was in the parking lot, Echols did not enter Powell's residence on the evening of the shooting. Trial counsel's choice to pursue the theory that Eutsey committed the crime is consistent with Echols's identification of Eutsey as one of the assailants. The Eutsey theory also offered a rebuttal to the state's charge that Echols made false statements against Eutsey. While Echols now characterizes the defense as "absurd" (Appellant's Opening Br. at 17), trial counsel was able to obtain testimony from Eutsey in support of the theory, in that Eutsey took the stand and acknowledged that Officer Eutsey was his great uncle. In *Wiggins*, defense counsel failed to make an investigation of mitigating factors during a sentencing hearing. Here, as discussed above, trial counsel did undertake some investigation. Further, in *Wiggins*, "counsel failed to [even] discover" the mitigating evidence, 539 U.S. at 534, whereas, again, in this case the jury heard Smallwood's testimony. The Supreme Court of New Jersey thus did not unreasonably apply *Strickland* in determining that trial counsel's performance was not constitutionally deficient.

20

Echols also argues that trial counsel's performance in his direct examination of Smallwood was deficient because trial counsel did not obtain clear alibi testimony. The fundamental premise of Echols's argument is that Smallwood's testimony at the proffer hearing clearly established an alibi while his subsequent testimony before the jury did not. The Supreme Court of New Jersey, however, determined that Smallwood's testimony "was sufficient, if believed, for the jury to comprehend that Smallwood claimed that he, [Echols], and others were in the parking lot when the shots were fired inside the apartment." *Echols*, 972 A.2d at 1101. Based on that determination, the Court concluded that trial counsel's performance was not deficient and that the difference between Smallwood's preliminary and jury testimony "could not have affected the outcome of the trial." *Id*.; *see Strickland*, 466 U.S. at 694 (stating that, in order to show prejudice, a defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different"). That line of reasoning was not an objectively unreasonable application of *Strickland*.

Echols also faults appellate counsel for failing to raise the trial court's denial of a request to offer a jury instruction regarding alibi as an issue on appeal. Due process requires that a defendant have competent representation both at trial and in a first appeal as of right. *Evitts*, 469 U.S. at 396 ("A first appeal as of right therefore is not adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney."). Appellate counsel, however, is not required to raise every non-frivolous issue on appeal but rather can and should make professional judgments regarding the issues most likely to prevail. *See Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)

("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues."). Thus, demonstrating that a non-frivolous issue was not raised is insufficient to meet *Strickland*'s standard for ineffective assistance. As with trial counsel, Echols must show both that appellate counsel was inept and that, but for counsel's unprofessional errors, the result would have been different. *Strickland*, 466 U.S. at 687. Further, habeas review of jury instructions is limited to those instances where the instructions violated a defendant's due process rights. *Estelle v. McGuire*, 502 U.S. 62, 72-73 (1991) ("The only question for us [in reviewing an allegedly erroneous jury instruction is] whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." (citation and internal quotation marks omitted)). A defendant's due process rights are violated, in turn, only where the instruction "operated to lift the burden of proof on an essential element of an offense as defined by state law." *Smith v. Horn*, 120 F.3d 400, 416 (3d Cir. 1997).

The Supreme Court of New Jersey determined that there was no due process violation in the failure of the trial court to offer an alibi instruction since the jury fully understood that "the prosecution had to prove beyond a reasonable doubt that [Echols] was present at the scene and committed the offense charged." *Echols*, 972 A.2d at 1103. The Court thus concluded that the failure to offer an alibi instruction was harmless and that, in turn, "even if appellate counsel had raised on appeal the trial court's failure to give the jury an alibi charge, the result would not have been different." *Id*. That determination was not an unreasonable application of *Strickland*.

22

Citing *Mathews v. United States*, Echols contends that "a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." 485 U.S. 58, 63 (1988). *Matthews*, however, relates to a District Court's failure to offer an instruction with respect to the affirmative defense of entrapment, a defense that has independent elements and presupposes commission of a crime. Here the theory all along was that Echols did not commit the crime and that he was in the parking lot when shots were fired. Echols cannot demonstrate that the lack of an alibi instruction operated to lift the burden of proof of an element of the offense. The instructions to the jury clearly indicated that the state had to prove that Echols committed the offense beyond a reasonable doubt. (App. at 198a ("The State must prove beyond a reasonable doubt that TERRANCE ECHOLS and JOSEPH BROWN are the persons who committed the crime.").) In order for the jury to convict, it had to make the determination that Echols was actually in the building and not in the parking lot. The New Jersey Supreme Court recognized as meritless Echols's argument that the jury would have presumed that it was the defense's burden to show that Echols was elsewhere. While Echols argues that the identity instruction, *see supra* note 8, did not help, the Supreme Court noted that it further reinforced that the jury had to make the determination, beyond a reasonable doubt, that Echols was actually the one who committed the crimes charged.

Echols cites *United States v. Zuniga*, 6 F.3d 569 (9th Cir. 1993), in support of his argument that the failure to give an alibi instruction is a due process violation, but that case's holding that an alibi instruction should be given "if it is supported by law and has

23

some foundation in the evidence" does not derive from a constitutional requirement. *Id.* at 570 (citation and internal quotation marks omitted). Indeed, the same court that produced *Zuniga* confirmed that "in habeas proceedings … relief is available only for *constitutional* violations" and it is not the case that "failure to give a specific alibi instruction is necessarily a *constitutional* violation." *Duckett v. Godinez*, 67 F.3d 734, 744 (9th Cir. 1995) (emphasis in original).

Because there is no constitutional requirement for an alibi instruction and because the instructions given by the trial court in this case made it clear that the government had to prove beyond a reasonable doubt that Echols was in the apartment complex when the shooting occurred, the Supreme Court of New Jersey did not unreasonably apply *Strickland* in determining that appellate counsel was not ineffective for choosing to focus on other issues on direct appeal.[12]

C.    *The Prosecutor's Opening Remarks*

Echols also argues that appellate counsel was ineffective for not raising the prosecutorial misconduct issue with respect to the opening remarks that referenced the safety of the jurors. To be entitled to habeas relief, Echols must first show that the remarks "so infected the trial with unfairness as to make the resulting conviction a denial

---

[12] Echols's appellate counsel raised a number of issues, including the jury instructions with respect to burglary and felony murder, the admission of the threat made to Dansby on the morning of her testimony, the admission of a statement that "everyone is scared" of Echols, prosecutorial misconduct for a statement made during summation that Echols and Brown did everything they could to keep people from testifying, that a mistrial should have been declared because the jury saw Echols handcuffed at one point in the proceedings, and alleged errors in sentencing. (App. at 442-44a.)

24

of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *see Darden v. Wainwright*, 477 U.S. 168, 181 (1986). The remarks must be examined "in context and in light of the entire trial." *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001).

The complained-of statement by the prosecutor was that "[court] officers are here, so that you can feel safe and comfortable. You know that nothing is going to happen to you." (App. at 270a.) The Supreme Court of New Jersey interpreted that remark as explaining the mindset of the recanting witnesses rather than an effort to place the jurors in fear for their safety. *See United States v. Young*, 470 U.S. 1, 11 (1985) ("[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial."). The Court further noted that "the prosecutor's brief reference to the safety of the jury in the beginning of the eighteen-day trial was not so egregious as to be reversible error." *Echols*, 972 A.2d at 1100; *cf. United States v. Zehrbach*, 47 F.3d 1252, 1266-67 (3d Cir. 1995) (a brief "improper and irrelevant" remark that "sought to influence the decision of the jury on an illegitimate basis" did not amount to a due process violation because "the comments at issue were but two sentences in a closing argument that filled forty pages of transcript"); *see also United States v. Homer*, 545 F.2d 864, 868 (3d Cir. 1976) ("Our awareness of the nature of opening and closing arguments in an adversary proceeding and our concern for judicial administration preclude us from setting aside a verdict and ordering a new trial every time an advocate is verbally indiscreet unless his remarks are obviously prejudicial. … The prosecutor's questionable comment constituted two small

25

paragraphs in the sixty pages of his closing argument. … under these circumstances, the remarks of the prosecutor were not so pervasive, gross, or inflammatory as to constitute prejudicial error.").  The Court thus determined that the prosecutor's reference to juror safety did not, taken in context, deprive Echols of his due process right to a fair trial.  We cannot say that that determination was an unreasonable application of *Strickland*.[13]

## III.    Conclusion

For the forgoing reasons, we will affirm the judgment of the District Court.

---

[13] Echols also argues that relief should be granted on the basis of cumulative error. Such a remedy is warranted only where the errors resulted in an unfair trial that made the resulting conviction a denial of due process.  *Donnelly*, 416 U.S. at 643.  For the reasons discussed above, each of the issues Echols raises does not amount to a due process violation, nor does the sum of them.